[Cite as *Harris v. Dept. of Rehab. & Corr.*, 2018-Ohio-2276.]

| | |
|---|---|
| HERMAN HARRIS, JR | Case No. 2016-00883JD |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO DEPARTMENT OF REHABILITATION AND CORRECTION | |
| Defendant | |

{¶1} Plaintiff, an inmate in the custody and control of defendant, brought this action for negligence arising out of injuries he sustained in an accident that occurred while he worked at his job in the central food service area of the Pickaway Correctional Institution (PCI) on May 2, 2016. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶2} At trial, plaintiff testified that he had been assigned to work in the central food service area for about one year leading up to the accident. Plaintiff related that he primarily served at the direction of the Aramark Corporation personnel who operate the food service at PCI and that they had him perform various duties around the kitchen, snack room, and dining hall. On the day of the accident, plaintiff stated, he was tasked to dispose of a large quantity of frozen French toast. Plaintiff stated that to do so required moving the food from the freezer to the food waste pulper, a distance of about 25 yards. Plaintiff explained that the food had been stored on sheet pans which he slid onto a bun rack that was a little over six feet tall and about two feet wide. The rack had wheels that swiveled, plaintiff stated, and once it was loaded he pushed it toward the pulper. Plaintiff recounted using the rack to a limited extent in the past, but stated that he had never used a rack to move food more than a very short distance and had never taken food to the pulper. Plaintiff, who gave his height as 6'1", testified that he could not see around the rack when pushing it.

{¶3} After plaintiff proceeded through a gate and turned into the area where the pulper was situated, one of the front wheels of the rack became caught atop a floor drain cover that was recessed below the surrounding surface of the floor, he stated. According to plaintiff, the rack "jumped" and the sheet pans began to slide off. Plaintiff testified that as he tried to block the pans from sliding off, the entire rack tipped over and he fell, with the rack and sheet pans landing on top of him. Describing the floor drain in which the wheel had become lodged, plaintiff estimated that the drain cover was about 2½ inches below the surface of the surrounding floor, although he acknowledged stating in his deposition that the depth was probably about half an inch. Plaintiff testified that a photograph admitted into evidence as Plaintiff's Exhibit 4 appears to depict the drain and its partially-cracked drain cover, but he stated that at the time of the accident the drain cover was recessed deeper than it is in the photograph and it had more of a grimy appearance. Plaintiff was unsure whether a photograph admitted into evidence as Defendant's Exhibit A shows the same drain. According to plaintiff, there were other inmates around when the accident happened, but he was unable to recall who they were.

{¶4} Plaintiff testified that when he started to get up from the floor, Corrections Officer Rhett Butler entered the room and he told Butler what happened. Plaintiff remembered Butler asking if he was okay and if he needed to go to the infirmary. Plaintiff, who recounted significant pain in his side, lower back, neck and head, stated that after waiting for an institutional headcount to finish he went to the infirmary and was seen by a nurse. Plaintiff testified that he explained to the nurse what happened and what his symptoms were, and the nurse gave him some pain-relief medication and advised that he would likely have some temporary soreness. Plaintiff's statements to the nurse, describing the cause of his injuries, were recorded in a Medical Exam Report. (Plaintiff's Exhibit 7.) Plaintiff testified that after about an hour in the infirmary he returned to the central food service area and updated Butler, who had him sign an

Inmate Accident Report that made no mention of a wheel getting caught in the drain, but stated instead that he "slipped pulling the rack to the pulper." (Plaintiff's Exhibit 1.) According to plaintiff, he never told Butler that he slipped or that the floor was greasy, and, because he assumed that Butler accurately reported how the accident happened, he paid little attention to the report when signing it, which occurred sometime between 1:30 p.m. and the end of the shift at 2:00 p.m.

{¶5} As plaintiff explained, he felt persistent pain over the following days and was eventually diagnosed with broken ribs. Plaintiff testified about some issues he had with his medical care and how he reached out to the Institutional Inspector for assistance. Plaintiff also testified about two Informal Complaint Resolution (ICR) forms that he submitted to Maintenance Superintendent Larry Parker regarding the drain. (Plaintiff's Exhibits 8, 9.) Plaintiff explained that after he sent the first ICR it became apparent that the maintenance department misidentified which drain was at issue, so he filed the second ICR and thereafter Parker and another maintenance superintendent came to the kitchen and had him identify the drain, which still had the same cover.

{¶6} Corrections Officer Rhett Butler testified that at the time of the accident he served as a relief officer throughout PCI, and on that particular day he worked the first shift (6:00 a.m. to 2:00 p.m.) in the back dock of the central food service area, a post that he manned about two or three times a month. When the accident happened, Butler went on, he was filling out a logbook in an adjacent office and heard a clatter. Butler related that within a few seconds he exited the office and saw plaintiff coming toward him, obviously in discomfort. Butler recalled that the rack was turned on its side, resting on the floor between the pulper and the drain, but not over the drain. Butler explained that the rack had swiveling wheels and was commonly used in the kitchen for moving food around, and he estimated that it was about six feet tall and one to one-and-a-half feet wide.

{¶7} According to Butler, plaintiff told him that the floor was slick and that he slipped and fell, and plaintiff complained that his chest hurt. Butler stated that he phoned the infirmary and arranged to send plaintiff there to be examined. By Butler's account, after plaintiff returned from the infirmary and gave him an update on his condition, Butler called his shift supervisor to apprise him of what had happened and then got on a computer and pulled up the Inmate Accident Report form which he filled out in plaintiff's presence. (Plaintiff's Exhibit 1.) Butler stated that since he did not witness the accident, apart from the noise he heard and his observations upon entering the room, his only source of information was plaintiff. It was Butler's testimony that plaintiff said nothing to him at the time about the drain, nor did Butler have any specific recollection about the condition of the drain before the accident. Butler acknowledged though that the report made no mention of the floor being slick like he recalled plaintiff telling him. Butler testified that once the report was completed, he showed it to plaintiff, plaintiff said it looked good, and he printed a copy which they both signed.

{¶8} Maintenance Superintendent Larry Parker provided testimony about receiving and responding to plaintiff's ICRs regarding the drain. (Plaintiff's Exhibits 8, 9.) Parker also testified, to the limited extent that it would pertain to the condition of the drain at the time of the accident, about two work orders the maintenance department received after the accident. (Plaintiff's Exhibits 2, 3.) However, while Parker testified that he went and looked at the drain at some point, he could not recall when that happened nor what the drain looked like at the time. Parker had no personal knowledge of how or when the photographs entered into evidence as Plaintiff's Exhibit 4 and Defendant's Exhibit A were created nor whether the drain looked that way when he went to see it, but he stated that the drain looks different now than it does in the photographs.

{¶9} When asked if the maintenance department conducts regular inspections of the kitchen, Parker's response was that there is an employee of the maintenance

department assigned to the kitchen. Questioned further about whether anyone is assigned to conduct a safety inspection or walk-through on any kind of regular basis, in similar fashion Parker stated that there is a maintenance department employee in the kitchen every day, apparently making repairs and otherwise responding to work orders. In the same vein, the question was put to Parker whether the maintenance department has any inspection reports or other documentary evidence on file that would show that the premises were being inspected, and Parker replied that there is a database of all the work orders that have been submitted and he also mentioned there being some kind of general preventive maintenance program but did not explain what it entails or indicate that it had anything to do with inspection or upkeep of the drain.

{¶10} Institutional Inspector Mary Lawrence testified that as part her job duties she investigates and responds to inmate complaints and grievances. Lawrence talked about investigating an ICR that she received from plaintiff pertaining to his medical care after the accident. Lawrence explained that when addressing the ICR her focus was not the manner of injury but rather plaintiff's subsequent medical issues. Lawrence stated, though, that she did view the drain at some point, but she could not remember exactly when. According to Lawrence, the drain depicted in Plaintiff's Exhibit 4 looks kind of like what she saw.

{¶11} "In a claim predicated on negligence, plaintiff bears the burden of proving by a preponderance of the evidence that defendant breached a duty owed to him and that this breach proximately caused the injury." *Woods v. Ohio Dept. of Rehab. & Corr.*, 130 Ohio App.3d 742, 744, 721 N.E.2d 143 (10th Dist.1998). "Typically under Ohio law, premises liability is dependent upon the injured person's status as an invitee, licensee, or a trespasser. * * * However, with respect to custodial relationships between the state and its inmates, the state has a duty to exercise reasonable care to prevent prisoners in its custody from being injured by dangerous conditions about which the state knows or should know." *Cordell v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 08AP-

749, 2009-Ohio-1555, ¶ 6; *see also Moore v. Ohio Dept. of Rehab. & Corr.*, 89 Ohio App.3d 107, 112, 623 N.E.2d 1214 (10th Dist.1993).

{¶12} "The state's duty of reasonable care does not render it an insurer of inmate safety." *Allen v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 14AP-619, 2015-Ohio-383, ¶ 17. "Reasonable care is that degree of caution and foresight an ordinarily prudent person would employ in similar circumstances, and includes the duty to exercise reasonable care to prevent an inmate from being injured by a dangerous condition about which the state knows or should know." *McElfresh v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 04AP-177, 2004-Ohio-5545, ¶ 16. "Where an inmate also performs labor for the state, the state's duty must be defined in the context of those additional factors which characterize the particular work performed." *Barnett v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 09AP-1186, 2010-Ohio-4737, ¶ 18.

{¶13} Upon consideration of the evidence presented at trial, the magistrate finds the following. Plaintiff was assigned to an inmate work detail in the central food service area of PCI. As part of his work responsibilities, on May 2, 2016, plaintiff was assigned the task of moving a quantity of frozen food from a freezer to a food waste pulper for disposal. Plaintiff loaded several sheet pans full of frozen food onto the rack which he then pushed toward the pulper. The rack partially obstructed plaintiff's view and plaintiff had never before taken food to the pulper. As plaintiff approached the pulper, one of the front wheels of the rack rolled down into a void that existed where the cover of a floor drain was recessed below the surface of the surrounding floor. The wheel got caught in the void and the rack tipped such that the sheet pans started sliding off. Plaintiff moved to block the sheet pans from sliding completely off but the entire rack tipped over. Plaintiff fell to the ground and was struck by the falling sheet pans and rack, resulting in injuries.

{¶14} The depth to which the drain cover was recessed below the surface of the surrounding floor was not precisely established.  Defendant, relying upon the so-called "two-inch rule," argues that the defect was an insubstantial one for which there can be no liability.  *See Dubenion v. DDR Corp.*, 10th Dist. Franklin No. 15AP-915, 2016-Ohio-8128, ¶ 15, quoting *Cash v. Cincinnati*, 66 Ohio St.2d 319, 323, 421 N.E.2d 1275 (1981) ("Ohio law has remained steadfast over the years, a claimed defect in sidewalks that is two inches or less is an 'insignificant, trivial and unsubstantial condition, which is not actionable as a matter of law.'"); *see also Jenkins v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-787, 2013-Ohio-5106, ¶ 15 ("the two-inch rule not only applies to walkways in municipalities but has also been applied to ODRC").  It is more probable than not that the difference in elevation was closer to the half-inch estimate plaintiff gave at his deposition rather than the 2½-inch estimate he gave at trial.  As for the photographs entered into evidence, plaintiff identified the drain cover in Plaintiff's Exhibit 4 by the partial crack in its surface that also seems to be visible in Defendant's Exhibit A, but it is unknown whether the photographs otherwise depict the drain and surrounding floor as they appeared at the time of the accident, and even if they do it is difficult to discern the depth of the drain cover.

{¶15} Although the difference in elevation between the drain cover and the surrounding floor was probably less than two inches it is apparent that the difference was significant enough to enable one of the wheels to roll down onto the drain cover and became lodged in the void, causing the contents of the rack to shift and the rack to tip over.  When this happened, plaintiff was performing labor for the state.  In the food service area where he and other inmates worked, rolling racks like the one involved here were commonly used.  It was foreseeable that significant unevenness or voids in the floor would cause a rack, especially one as tall and narrow as the one involved here, or its contents to fall and injure someone.  The difference in elevation between the drain cover and the surrounding floor was significant enough that a reasonably prudent

person would have anticipated that an injury was likely to result if an inmate pushed a loaded rack over the drain and one of the wheels got caught in the void. Thus, in the context of the factors that characterized the work being performed, the unevenness between the drain cover and the surrounding floor was such that it posed an unreasonable danger.

{¶16} To establish that defendant breached its duty of reasonable care, however, plaintiff had the burden "to prove that ODRC or its agents created the hazard or had actual or constructive notice of the hazard and failed to remedy it." *Hill v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-265, 2012-Ohio-5304, ¶ 11. No evidence was presented in this case to demonstrate that defendant created the hazard; it would be speculative to conclude that the condition of the floor drain resulted from defendant or its agents installing it that way as opposed to, for example, some destructive force, deteriorative process, or material failure. There was also no evidence that defendant had actual notice of the hazard. It was not shown that anyone had reported a problem with the drain, nor was there evidence of any prior accidents involving the drain. (It is noted that one of the work orders at least arguably refers to a drain having been involved in multiple accidents, but the work order was not admitted for that purpose and even if it had been it does not state that any accident occurred before plaintiff's, there was no supporting testimony, and, from plaintiff's account of the maintenance department's actions, it may pertain to a different drain. Plaintiff's Exhibit 3.)

{¶17} "If * * * a plaintiff cannot establish that the owner or its agents created the hazard or possessed actual knowledge of the hazard, evidence showing the length of time during which the hazard existed is necessary to support an inference that the owner had constructive knowledge of the hazard such that the failure to remove or warn of the hazard was a breach of ordinary care." *Price v. United Dairy Farmers, Inc.*, 10th Dist. Franklin No. 04AP-83, 2004-Ohio-3392, ¶ 7; *see also Jenkins* at ¶ 12. "An owner is charged with constructive knowledge of defects that would have been revealed by a

reasonable inspection of the premises." *Stenger v. Timmons*, 10th Dist. Franklin No. 10AP-528, 2011-Ohio-1257, ¶ 7.

{¶18} Significantly, plaintiff failed to present credible evidence to show that the hazard had existed for any length of time. No one testified as to how long there had been this difference between the elevation of the drain cover and the surrounding floor. Plaintiff had worked in the central food service area for one year by the time he was injured yet gave no indication in his testimony that he had seen the defective state of the drain at any time before the accident. Butler also worked in the area regularly and had no recollection of the defect. Plaintiff asserted that the photographs show deterioration in a ring of concrete or grout around the drain and that this deterioration must have occurred far enough in the past that defendant should have known about it. As previously stated, however, it was not established that the photographs show what the drain looked like at the time of the accident, and indeed plaintiff said there was a difference in that the drain cover was recessed more deeply at that time. Even if it were assumed, for argument's sake, that the photographs do depict what the drain looked like at the time of the accident, one can only conjecture how long it had been in that condition. And, regardless of how long there had been some deterioration in the narrow ring of concrete or grout around the drain, the most significant aspect of the hazard was the depth of the drain cover, and the record is devoid of facts as to the length of time it had been in that state.

{¶19} "A plaintiff cannot prove constructive notice of a hazard without a factual basis that the hazard existed for a sufficient time to enable the exercise of ordinary care." *Sharp v. Andersons, Inc.*, 10th Dist. Franklin No. 06AP-81, 2006-Ohio-4075, ¶ 11. While plaintiff emphasizes the lack of evidence about the drain being subject to any formal inspection or maintenance program, it was not shown that the defect with the drain existed for such length of time to allow an inference that defendant's not warning against it or repairing it resulted from a failure to exercise reasonable care. Although

the magistrate is not without sympathy for the harm that plaintiff suffered, the fact of plaintiff's injury alone does not give rise to an inference of negligence, as it is essential that there "'be direct proof of a fact from which the inference can reasonably be drawn.'" *Balcar v. Wal-Mart Store No. 2726*, 10th Dist. Franklin No. 12AP-344, 2012-Ohio-6027, ¶ 10, quoting *Parras v. Std. Oil Co.*, 160 Ohio St. 315, 319, 116 N.E.2d 300 (1953). The absence of such proof to support an inference of constructive knowledge precludes the relief that plaintiff seeks.

**{¶20}** Based on the foregoing, the magistrate finds that plaintiff failed to prove his claim by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

**{¶21}** *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

ROBERT VAN SCHOYCK
Magistrate

**Filed May 23, 2018**
**Sent to S.C. Reporter 6/12/18**